IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

February 22, 2013
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 11-1224 and 11-1486

KANAWHA COUNTY PUBLIC LIBRARY BOARD,
a public corporation; WEST VIRGINIA BOARD OF EDUCATION,
a public corporation; and DR. JOREA MARPLE,
in her official capacity as Superintendent of Schools of the State of West Virginia,
Intervenor/Defendants Below, Petitioners

v.

THE BOARD OF EDUCATION OF THE COUNTY OF KANAWHA,
Plaintiff Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable Paul Zakaib, Jr., Judge
Civil Action No. 08-C-2020

AFFIRMED

Submitted:  January 16, 2013
Filed:  February 22, 2013

Christopher J. Winton, Esq.
Ray, Winton & Kelley, PLLC
Charleston, West Virginia
*and*
Larry L. Rowe, Esq.
Charleston, West Virginia
Attorneys for Kanawha County Public Library Board

Albert F. Sebok, Esq.
Jonathan L. Anderson, Esq.
Jackson Kelly PLLC
Charleston, West Virginia
Attorneys for Respondent

Patrick Morrisey, Esq.
Attorney General
Kelli Talbott, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for West Virginia Board of Education and
Dr. Jorea Marple

Benjamin L. Bailey, Esq.
Bailey & Glasser, LLP
Charleston, West Virginia
Attorney for Amicus Curiae West Virginia Library
Association

Anthony I. Werner, Esq.
Bachmann, Hess, Bachmann & Garden, PLLC
Wheeling, West Virginia
*and*
Jeffrey A. Holmstrand, Esq.
David S. Givens
Flaherty Sensabaugh Bonasso, PLLC
Wheeling, West Virginia
Attorneys for Amici Curiae The Ohio County Public Library
and other interested West Virginia Public Libraries

JUSTICE WORKMAN delivered the Opinion of the Court.

CHIEF JUSTICE BENJAMIN dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1.     "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. American Travellers Life Ins. Co.,* 204 W. Va. 430, 513 S.E.2d 657 (1998).

2.     "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

3.     "Where the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de novo* standard of review." Syl. Pt. 1, in part, *Chrystal R. M. v. Charlie A. L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

4.     "Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. The claimed discrimination must be a product of state action as distinguished from a purely private activity." Syl. Pt. 2, *Israel v. West Virginia Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989).

5.     To establish *jus tertii* standing to vindicate the constitutional rights of a third party, a litigant must (1) have suffered an injury in fact; (2) have a close

i

relation to the third party; and (3) demonstrate some hindrance to the third party's ability to protect his or her own interests.

6. "At a minimum, the party making an informal Rule 56(f) motion must satisfy four requirements. It should (1) articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet become accessible to the party; (2) demonstrate some realistic prospect that the material facts can be obtained within a reasonable additional time period; (3) demonstrate that the material facts will, if obtained, suffice to engender an issue both genuine and material; and (4) demonstrate good cause for failure to have conducted the discovery earlier." Syl. Pt. 1, in part, *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd*., 196 W. Va. 692, 474 S.E.2d 872 (1996).

7. "'In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. . . .' Syllabus Point 1, *Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965)." Syl. Pt. 2, in part, *Hartley Hill Hunt Club v. County Commission of Ritchie County*, 220 W. Va. 382, 647 S.E.2d 818 (2007).

8.     "The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State."  Syl. Pt. 3, *Pauley v. Kelly,* 162 W. Va. 672, 255 S.E.2d 859 (1979).

9.     "Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification."  Syl. Pt. 4, *Pauley v. Kelly,* 162 W. Va. 672, 255 S.E.2d 859 (1979).

10.     "A statute that creates a lack of uniformity in the State's educational financing system is subject to strict scrutiny, and this discrimination will be upheld only if necessary to further a compelling state interest."  Syl. Pt. 4, *Bd. of Educ. of the Cnty. of Kanawha v. West Virginia Bd. Of Educ.*, 219 W. Va. 801, 639 S.E.2d 893 (2006).

11.     "W. Va. Code § 18-9A-12 (1993), to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose, violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement."

Syl. Pt. 6, *Bd. Of Educ. of the Cnty. of Kanawha v. West Virginia Bd. of Educ.*, 219 W. Va. 801, 639 S.E.2d 893 (2006).

12.     W. Va. Code § 18-9A-11 (2008), as amended, to the extent that it creates a lack of uniformity in the educational financing system by requiring counties set forth in W. Va. Code § 18-9A-11(g)(1) through (9) to pay their respective "Special Act" mandatory library funding obligations from their discretionary retainage or transfer the obligation to their excess levies, violates equal protection and is therefore, unconstitutional and unenforceable.

13.     Chapter 178 of the Acts of the Legislature, Regular Session, 1957 (also known as the "Kanawha Special Act"), insofar only as pertains to the obligation of the Kanawha County Board of Education to divert a portion of its regular or excess levy receipts to the Kanawha County Public Library Board, is unconstitutional and unenforceable.

iv

WORKMAN, Justice:

This is an appeal of the Circuit Court of Kanawha County's September 27, 2011, order refusing to set aside its July 28, 2011, orders denying the motion to dismiss of the petitioner/intervenor below, Kanawha County Public Library Board (hereinafter "the Library"), and granting summary judgment and injunctive relief in favor of respondent/plaintiff below, The Board of Education of the County of Kanawha (hereinafter the "Kanawha County BOE"). The July 28, 2011, orders 1) found that the Kanawha County BOE had standing to bring the underlying equal protection challenge and 2) invalidated as unconstitutional W. Va. Code § 18-9A-11 (2008) and Chapter 178 of the Acts of the Legislature, Regular Session, 1957 (hereinafter the "Kanawha Special Act") to the extent that they require the Kanawha County BOE to divert a portion of its regular levy receipts in support of the Library or transfer the funding obligation to its excess levy. The order further enjoined both the Library and petitioners/defendants below, the West Virginia Board of Education and Dr. Jorea Marple (hereinafter the "West Virginia BOE," collectively) from enforcing or attempting to enforce the requirements of W. Va. Code § 18-9A-11 and the Kanawha Special Act as same pertain to the Kanawha County BOE's library funding obligation. Upon consideration of the

1

briefs[1] and oral argument, the record submitted, and pertinent authorities, we affirm the ruling of the circuit court.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of the West Virginia Legislature's response to this Court's 2006 opinion in *Board of Education of the County of Kanawha v. West Virginia Board of Education*, 219 W. Va. 801, 639 S.E.2d 893 (2006) (hereinafter "*Board I*"), which held that W. Va. Code § 18-9A-12 (1993) was unconstitutional. The underlying litigation involves, in general, the Legislature's enactment of "Special Acts" for nine county boards of education requiring them to divert a portion of their regular levy receipts in support of their local public libraries (hereinafter "Special Act Libraries" or "Special Act Counties").[2] The Kanawha Special Act was passed in 1957. Chapter 178 of the Acts of the Legislature, Regular Session, 1957. The Kanawha Special Act requires the City of Charleston, Kanawha County Commission, and Kanawha County BOE to contribute to the funding of the Kanawha County Public Library.[3] *Id.*

---

[1] The Court wishes to acknowledge and express its appreciation for the contributions of the *amici curiae*. Separate briefs were submitted on behalf of The West Virginia Library Association and collectively on behalf of The Ohio County Public Library and other interested West Virginia Public Libraries.

[2] Other counties with Special Act Libraries are: Berkeley, Hardy, Harrison, Ohio, Raleigh, Tyler, Upshur, and Wood.

[3] The Kanawha Special Act provides, in pertinent part:
(continued . . .)

In 2003, the Kanawha County BOE sought declaratory and injunctive relief from the Circuit Court of Kanawha County on the basis that the requirement that it divert a portion of its regular levy receipts to the Library violated equal protection. *Board I,* 219 W. Va. at 805, 639 S.E.2d at 897. In particular, the Kanawha County BOE argued that, unlike non-Special Act Counties, it was being denied a portion of its "basic foundation program." *Id.* The "basic foundation program" is comprised of seven

---

> In order to provide for the support, maintenance and operation of the public library hereby created, and any and all branches thereof, the supporting governing authorities shall, upon written request by its board of directors, levy annually as follows within the respective taxing districts of the governing authorities, on each one hundred dollars of assessed valuation of the property taxable in the area served by it according to the last assessment for state and county purposes, amounts not exceeding the following amounts for the fiscal year beginning July first, one thousand nine hundred fifty-seven, and for each succeeding fiscal year, as follows: by the board of education of the county of Kanawha, class one, one cent; class two, two cents; class three, four cents; class four, four cents; by the county court of Kanawha County, class one, one cent; class two, two cents; class three, four cents; class four, four cents; and by the city of Charleston, class one, one cent; class two, two cents; class four, four cents. . . . In addition to the aforesaid amounts which, upon written request by the board, the governing authorities shall levy, each governing authority may support the public library with any other general or special revenues or excess levies. All income realized by the operation of the public library from any sources other than the above levies shall be used by the board of directors for the support and maintenance of the public library.

Chapter 178, Acts of the Legislature, Regular Session, 1957.

3

categories of expenses delineated in W. Va. Code § 18-9A-3, the sum of which makes up a county's minimum educational expense needs, such as salaries for educators, service professionals, transportation, administrative costs, and the like. The basic foundation program is funded by a "local share"—paid from the estimated tax revenue produced by levies, at specified rates, on all real property situate in the county as set forth in W. Va. Code § 18-9A-11—and a "State share." After the basic foundation program sum is determined, the county's local share is calculated and deducted from the basic foundation program total, leaving the amount due from the State for its share pursuant to W. Va. Code § 18-9A-12. Inasmuch as the Kanawha BOE was being required to divert a portion of its local share to the Library, it alleged in the 2003 litigation that it was being treated disparately, creating an inequality in school funding in Kanawha County. *Board I,* 219 W. Va. at 805, 639 S.E.2d at 897. The circuit court found that because the Kanawha County BOE was at that time operating at a surplus, its basic foundation program funds were not being impacted and therefore, there was no constitutional infringement. *Id.* at 805-06, 639 S.E.2d at 897-98.

In 2006, this Court reversed, finding that W. Va. Code § 18-9A-12 did in fact violate equal protection. *Id.* at 808, 639 S.E.2d at 900. The Court held that to the extent that the state share of the basic education program was not increased to accommodate the Kanawha County BOE's required diversion of the local share, it was being treated unequally. *Id.* The Court found no compelling state interest which justified

4

the unequal treatment and therefore held that W. Va. Code § 18-9A-12 was unconstitutional. In particular, the Court stated:

> When we apply the strict scrutiny test to the present facts, we can find no compelling reason that justifies treating those school boards differently that are charged by law with applying a portion of their local share to support a non-school purpose such as a public library. . . . Simply put, the more than 2.2 million dollars directed each year to the support of the library is money taken from the support of school children in the classrooms of Kanawha County schools. This, in turn, potentially impinges on a school board's ability to provide a thorough and efficient education to its students.

*Board I,* 219 W. Va. at 807-08, 639 S.E.2d at 899-900. The Court then issued the following syllabus point:

> W. Va. Code § 18-9A-12 (1993), to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose, violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement.

Syl. Pt. 6, *Board I.* The Court stayed the effect of this ruling to permit the Legislature to amend the "applicable statutes." *Id.* at 808, 639 S.E.2d at 900.

However, rather than amending W. Va. Code § 18-9A-12, which sets forth the calculation of the State share, to require the state to increase its share to account for

5

the Kanawha County BOE's library funding obligation,[4] the Legislature amended W. Va. Code § 18-9A-11 which governs calculation of a county's local share. The Legislature seized upon the "non-school purpose" language in the opinion and specifically incorporated reference to the Special Act Libraries and Counties into the Code section, setting forth specific findings that libraries serve a "legitimate school purpose."[5]

Critically, in an apparent effort to equalize the effect on the basic foundation program funds, the statute was further amended to provide that the library funding obligation created by a Special Act would now be placed upon only the

---

[4] *See* note 22, *infra.*

[5]W. Va. Code § 18-9A-11(f) was amended to include the following, in pertinent part:

> The Legislature finds that public school systems throughout the State provide support in varying degrees to public libraries through a variety of means including budgeted allocations, excess levy funds and portions of their regular school board levies as may be provided by special act. A number of public libraries are situated on the campuses of public schools and several are within public school buildings serving both the students and public patrons. To the extent that public schools recognize and choose to avail the resources of public libraries toward developing within their students such legally recognized elements of a thorough and efficient education as literacy, interests in literature, knowledge of government and the world around them and preparation for advanced academic training, work and citizenship, public libraries serve a legitimate school purpose and may do so economically.

"discretionary retainage" resulting from the regular levy receipts.[6] The statute defines "discretionary retainage" as "the amount by which the regular school board levies exceeds [sic] the local share as determined hereunder," thereby leaving the local share of the basic foundation program intact.[7] W. Va. Code § 18-9A-11(f). The statute further provides that if the discretionary retainage is less than the funding obligation, the library funding obligation is reduced to the amount of the discretionary retainage; likewise if the retainage is more than the funding obligation, the school board may retain any excess and use it as it sees fit.[8] Significantly, the statute also provides that a Special Act County may transfer its funding obligation to its excess levy, provided that it includes a specific line

---

[6] W. Va. Code § 18-9A-11(f) provides, in pertinent part, that "[f]or the purposes of any computation made in accordance with the provisions of this section, the library funding obligation on the regular school board levies which is created by a special act and is due and payable from the levy revenues to a library shall be paid from the county school board's discretionary retainage[.]"

[7] The actual regular levy receipts may be greater than the estimated receipts, likely occasioned by an automatic statutory 5% deduction for "usual losses in collections due to discounts, exonerations, delinquencies, and the like." W. Va. Code § 18-9A-11(a)(2).

[8] W. Va. Code § 18-9A-11(f) provides, in pertinent part:

> If the library funding obligation which is created by a special act and is due and payable to a library is greater than the county school board's discretionary retainage, the library funding obligation created by the special act is amended and is reduced to the amount of the discretionary retainage, notwithstanding any provisions of the special act to the contrary. Any excess of the discretionary retainage over the library funding obligation shall be available for expenditure by the county board in its discretion for its properly budgeted purposes.

7

item in the levy for the library funding obligation. If the levy fails, the funding obligation is voided, but the county must continue to include the funding obligation in any subsequent excess levies.[9]

---

[9] W. Va. Code § 18-9A-11(h) provides, in pertinent part:

> Notwithstanding any provision of any special act set forth in subsection (g) of this section to the contrary, the county board of any county with a special act creating a library obligation out of the county's regular school levy revenues may transfer that library obligation so that it becomes a continuing obligation of its excess levy revenues instead of an obligation of its regular school levy revenues, subject to the following:
>
>> (1) If a county board chooses to transfer the library obligation pursuant to this subsection, the library funding obligation shall remain an obligation of the regular school levy revenues until the fiscal year in which the excess levy is effective or would have been effective if it had been passed by the voters;
>>
>> (2) If a county board chooses to transfer the library obligation pursuant to this subsection, the county board shall include the funding of the public library obligation in the same amount as its library funding obligation which exists or had existed on its regular levy revenues as one of the purposes for the excess levy to be voted on as a specifically described line item of the excess levy: Provided, That if the county board has transferred the library obligation to the excess levy and the excess levy fails to be passed by the voters or the excess levy passes and thereafter expires upon the time limit for continuation as set forth in section sixteen, [§ 11-8-16], article eight, chapter eleven of this code, then in any subsequent excess levy which the county board thereafter submits to the voters the library funding obligation again shall be included

(continued . . .)

After the amendments to the statute, in October, 2008, the Kanawha County BOE filed the instant action against the West Virginia BOE and Dr. Steven Payne, Superintendent (restyled at the time of the appeal to reflect Dr. Jorea Marple as Superintendent); subsequent to the filing, the Library moved to intervene. The complaint requested that the circuit court declare unconstitutional "W. Va. Code § 18-9A-11 and related provisions of the West Virginia Code, as interpreted and applied by the defendants, in combination with the Special Act" and enter an order enjoining the defendants from requiring the Kanawha County BOE to fund its library obligation. The Kanawha County BOE moved for summary judgment a little over a year after the complaint was filed in November, 2009. Shortly after the motion for summary judgment was filed, the Library Board moved to dismiss, arguing that the Kanawha County BOE lacked standing inasmuch as it was not a "person" entitled to assert an equal protection claim.

---

as one of the purposes of the subsequent excess levy as a specifically described line item of the excess levy;

(3) If a county board chooses to transfer the library obligation pursuant to this subsection, regardless of whether or not the excess levy passes, effective the fiscal year in which the excess levy is effective or would have been effective if it had been passed by the voters, a county's library obligation on its regular levy revenues is void notwithstanding any provision of the special acts set forth in subsection (g) of this section to the contrary[.]

A hearing on the motions was held almost another year later in August, 2010. At no time was any discovery conducted, nor was a Scheduling Order entered. A Scheduling Conference was set on two occasions, but did not occur for reasons which are not entirely clear from the record. In response to the motion for summary judgment, no party submitted an affidavit pursuant to West Virginia Rule of Civil Procedure 56 averring that additional discovery was needed, although the suggestion was briefly included in the Library's brief in response.

On July 28, 2011, the circuit court denied the Library's motion to dismiss for lack of standing, ruling that the Kanawha County BOE had standing in its own right and, alternatively, had standing to pursue the equal protection claim "on behalf of adversely affected students of Kanawha County schools." Citing this Court's "inherent power and duty" to examine jurisdictional issues *sua sponte*, the circuit court cited three other cases decided by this Court wherein a county board of education had advanced equal protection claims, and, inferring that standing must have been determined to exist in those cases, found that the Kanawha County BOE had standing. In addition, with little analysis, the circuit court cited to two federal cases which had determined that local boards of education could advance equal protection claims on behalf of their students and

10

determined that the Kanawha County BOE could likewise advance such a claim on behalf of its students.[10]

Having established standing, also on July 28, 2011, the circuit court entered an order granting summary judgment to the Kanawha County BOE, finding that, irrespective of the Legislature's amendments to W. Va. Code § 18-9A-11, an unconstitutional, discriminatory classification still existed with regard to the library funding obligation. In particular, the circuit court found that the fact that the library funding obligation had been statutorily transferred to the discretionary retainage or, at the county's option, to the excess levy, was of no moment. The circuit court likened the Legislature's attempt to move the obligation to the discretionary retainage to the faulty reasoning utilized by the lower court in *Board I* (i.e. that the county was operating at a surplus, therefore the basic foundation monies were unencumbered), which this Court rejected. Similarly, the circuit court found that moving the obligation to the excess levy was likewise unequal treatment since no other counties must do so and "are free to maximize their excess levy revenues for school purposes" and therefore, "are not subject to the risk of voters rejecting their excess levies due to the including of a multi-million dollar library funding obligation."

---

[10] *School Bd. of the City of Richmond, Virginia v. Baliles*, 829 F.2d 1308 (4th Cir. 1987); *Akron Bd. of Educ. v. State Bd. of Educ. of Ohio*, 490 F.2d 1285 (6th Cir. 1974).

11

Having determined that a discriminatory classification still existed that infringed on a fundamental constitutional right, the circuit court then determined that no compelling State interest presently existed to justify such unequal treatment, observing that this Court held that there was no such justification present in 2006: "[W]e can find no compelling reason that justifies treating those school boards differently[.]" *Board I*, 219 W. Va. at 807, 639 S.E.2d at 899. The circuit court rejected the petitioners' attempt to utilize the Legislature's finding that libraries serve a legitimate school purpose to justify the discriminatory classification; the circuit court ruled that such findings fail to demonstrate how the discriminatory classification is *necessary* to further the compelling state interest. The circuit court dispensed with the petitioners' contention that summary judgment was premature due to lack of discovery by noting that it could have conducted discovery at any time during the case's three-year pendency and noted its failure to provide an affidavit pursuant to W.V.R.C.P. 56.

Finally, the circuit court found that W. Va. Code § 18-9A-11, as amended, also violated the special legislation prohibitions of Article X, § 1b and Article XII, § 5 of the West Virginia Constitution. In short, the circuit court found that since the Constitution empowers the Legislature, under Article X, §1b, to enact only *statewide* excess school levies and delegates to local school districts, under Article X, §10, the ability to seek local excess levies, the attempt to encumber Kanawha County's local excess levy with the library obligation improperly "infringe[s] upon the initiative of the voters of Kanawha County." The circuit court reasoned that "[i]n order to exercise their

12

'local initiative' and tax themselves for additional educational funds in their county, Kanawha County voters are forced to also tax themselves for the support of a non-school purpose, which is the support of a public library."

Upon finding these constitutional violations, the circuit court ordered that both W. Va. Code § 18-9A-11 and the Kanawha Special Act were null and void, as pertains to the Kanawha County BOE's funding obligation.[11] The West Virginia BOE appealed immediately; the Library moved for reconsideration pursuant to W.V.R.C.P. 59 and, upon denial, appealed the court's orders. The circuit court granted a stay of its ruling pending these appeals, which were administratively consolidated before this Court.

## II. STANDARD OF REVIEW

This Court has held that:

---

[11] In particular, the circuit court's order states:

It is ORDERED that the Kanawha Special Act and Section 18-9A-11 of the Code, to the extent they require the Kanawha Board to divert a portion of its regular levy receipts for the support of the Kanawha Library, or to transfer the Kanawha Board's library funding obligation to its excess levy revenues, by and hereby are null and void and of no force and effect. It is ORDERED that the State and the Library Board be and hereby are enjoined from enforcing, or seeking to enforce, the requirements of Kanawha Special Act and Section 18-9A-11 of the Code as they pertain to the Kanawha Board's library funding obligation to the Kanawha Library.

> The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed.

Syl. Pt. 1, *Wickland v. American Travellers Life Ins. Co.,* 204 W. Va. 430, 513 S.E.2d 657 (1998). As such, "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Moreover, "[w]here the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de novo* standard of review." Syl. Pt. 1, in part, *Chrystal R. M. v. Charlie A. L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). As such, we find that all matters at issue in this appeal require a *de novo* standard of review.

## III. DISCUSSION

The Library and West Virginia BOE make three similar assignments of error. They both allege that the circuit court erred by: 1) finding that W. Va. Code § 18-9A-11 violates equal protection; 2) finding that W. Va. Code § 18-9A-11 violates Article XII, § 5 and Article X, §1b of the West Virginia Constitution; and 3) prematurely granting summary judgment. The Library makes two additional assignments of error: 1) that the circuit court erred by finding that the Kanawha County BOE has standing to

14

advance an equal protection claim; and 2) that the circuit court's order was overbroad in its determination that the Kanawha Special Act was "null and void."[12]

## A.

### *Standing*

We begin our analysis with the threshold issue of standing, a necessary prerequisite before reaching the merits of this appeal. The Library argues that a county board of education is simply not a "person" for purposes of equal protection and that a "legislatively-created, subordinate subdivision of government" cannot advance an equal protection argument against the Legislature, "its creator." The Kanawha County BOE argues that standing clearly exists because, if it did not, this Court would have so held in the prior cases filed by county boards of education which advanced equal protection challenges.[13] Respondent relies on Syllabus Point 2 of *James M. B. v. Carolyn M.*, 193 W. Va. 289, 456 S.E.2d 16 (1999) to contend that this Court necessarily considered and found standing in the prior cases despite an absence of discussion of the issue. Syllabus

---

[12] Although the West Virginia BOE expressly adopted and incorporated by reference the arguments made by the Library, we will attribute to the appropriate petitioner the different arguments advanced by each to the extent they differ in character and content.

[13] *See State ex rel. Bd. of Educ. for the Cnty. of Grant v. Manchin*, 179 W. Va. 235, 366 S.E.2d 743 (1988) (holding that State school funding formula failing to account for failure of excess levies violated equal protection); *State ex rel. Bd. of Educ. for the Cnty. of Randolph v. Bailey*, 192 W. Va. 534, 453 S.E.2d 368 (1994) (holding that State school funding formula as pertained to teacher and service personnel salaries violated equal protection); *Board I,* 219 W. Va. 801, 639 S.E.2d 893 (holding that library funding obligation violated equal protection).

15

Point 2 states, in pertinent part: "[T]his Court has the inherent power and duty to determine unilaterally its authority to hear a particular case." *Id.* In addition to having standing in its own right, the Kanawha County BOE further argues that it has standing to advance such claims on behalf of the students of Kanawha County.

Initially, we engage in a brief examination of the source of the constitutional claim at issue, as its language forms the basis of the Library's primary challenge to standing. The right of equal protection is expressly stated in the United States Constitution; the Fourteenth Amendment to the United States Constitution states that "[n]o state shall . . . deny to any *person* within its jurisdiction the equal protection of the laws." (emphasis added). Although the right of equal protection is not expressly stated in the West Virginia Constitution, this Court has found that equal protection likewise exists on a state level and derives from Article III, § 10 of the West Virginia Constitution:

> Equal protection of the law is guaranteed by Article III, Section 10 of our state constitution, which provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." *See* Syllabus Point 4, *Israel v. West Virginia Secondary Sch. Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989).

*O'Dell v. Town of Gauley Bridge,* 188 W.Va. 596, 601, 425 S.E.2d 551, 556 (1992). As to instances giving rise to equal protection scrutiny, in Syllabus Point 2 of *Israel v. West Virginia Secondary Sch. Activities Comm'n,* 182 W. Va. 454, 388 S.E.2d 480 (1989), this Court held that:

16

Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. The claimed discrimination must be a product of state action as distinguished from a purely private activity.

We dispense quickly with the argument that, having previously decided cases involving equal protection claims advanced by county boards of education, this Court has *sub silentio* determined that standing broadly exists for such claims. While this Court has noted its authority to *sua sponte* determine jurisdictional issues, including standing, it does not follow that an issue neither asserted by the parties nor addressed in this Court's opinions is binding upon it. This Court, like many others including the United States Supreme Court, adheres to the well-settled premise that "the exercise of jurisdiction in a case is not precedent for the existence of jurisdiction." *Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 of Pima County, Arizona v. Kirk*, 91 F.3d 1240, 1243 (9th Cir. 1996); *see also Lewis v. Casey,* 518 U.S. 343, 352 n.2 (1996) ("[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect."); *Hagans v. Lavine,* 415 U.S. 528, 535 n.5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."); *Grant v. Shalala,* 989 F.2d 1332, 1341 (3d Cir. 1993) (rejecting implicit holding of United States Supreme Court case where power of district court to make findings was not challenged); *Cousins v. Sec'y of the U.S. Dept. of Transp.,* 880 F.2d 603, 608 (1st Cir. 1989)(en banc) (noting nonbinding nature of questions "which merely lurk in the record" (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

17

However, we find that the bulk of the Library's arguments against standing—that a county school board is not entitled in its own right to equal protection because it is not a "person" and is wholly subordinate to the Legislature—are germane only to the issue of whether the Kanawha County BOE has first-party standing. Although the Kanawha County BOE asserts and the circuit court found the existence of first-party standing, it is fairly apparent to this Court that the gravamen of the respondent's equal protection claim is that the statute and Special Act at issue, as implemented, infringe upon the "thorough and efficient" education constitutionally guaranteed to the students of Kanawha County. As such, it is clear that the Kanawha County BOE is seeking to vindicate the constitutional rights of a third party—the students of Kanawha County—necessitating a more thorough analysis of whether it has properly established third-party or "*jus tertii*" standing. Despite the parties' and the circuit court's cursory treatment of this issue as a mere analog to first-party standing, we find that this concept is squarely implicated in this and other similar, historical equal protection challenges to legislation.

To that end, this Court recently adopted a test for "representative" standing—a form of third-party standing—however, we noted that other types of third-party standing existed to which the test formulated would not necessarily conform: "We note that there are other concepts of standing, *e.g.*, public interest standing, taxpayer standing, *constitutional jus tertii standing* . . . [h]owever, we need not discuss them in this Opinion because they are not applicable to the factual scenario at issue in this appeal."

18

*The Affiliated Construction Trades Found. v. West Virginia Dept. of Transp.*, 227 W. Va. 653, 657, n.8, 713 S.E.2d 809, 813 n.8 (2011)(emphasis added). We find that "representative" or "associational" standing is inapposite to the type of standing urged by the respondent in the case *sub judice* inasmuch as the Kanawha County BOE does not serve as an "association" of which the students of the county are organizational "members." Rather, the concept of so-called *jus tertii* standing, commonly used to describe situations in which one asserts the *constitutional* rights of a third party, is clearly more applicable.[14]

This Court has not previously set forth a test for determining the existence of *jus tertii* standing; however, in her concurring opinion in *State ex rel. Abraham Linc Corp. v. Bedell*, 216 W. Va. 99, 602 S.E.2d 542 (2004), Justice Davis endorsed and applied a test adopted by the United States Supreme Court and other state and Federal jurisdictions.[15] In *Powers v. Ohio*, 499 U.S. 400 (1991), the United States Supreme Court articulated a three-pronged test to determine whether a litigant may assert the rights of a third-party: "The litigant must have suffered an injury in fact . . . ; the litigant must have

---

[14] We note that this concept only first appeared in the Library's brief on appeal; although mention of standing "on behalf of" the students of Kanawha County made superficial appearance in the record below, none of the parties properly characterized or briefed this critical issue for analysis by the circuit court.

[15] *See id.* at 113-14, 602 S.E.2d at 556-57 (Davis, J. concurring) for a collection of extra-jurisdictional cases utilizing the *Powers* test.

a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 411 (citations omitted).

Not only has *jus tertii* standing been utilized generally to determine the ability of a litigant to advance the rights of others, but has been utilized in specific regard to a governmental entity's assertion of the constitutional rights of members of a class with whom it has a close relationship. In *City of East Liverpool v. Columbiana Co. Budget Comm'n*, 870 N.E.2d 705, 712 (Ohio 2007), the Supreme Court of Ohio utilized the *Powers* test to find that the City of East Liverpool had standing to assert an equal protection claim on behalf of its citizens, challenging a statute governing apportionment of state tax revenues. The court therein found that, as a result of the allegedly unequal apportionment of the funds, the city suffered a "direct injury to its own treasury" satisfying the first prong of the *Powers* test. *Id.* Moreover, the court found a close relation between the city and its citizens by noting that both had "an interdependent interest" in the city's treasury. *Id.* Finally, the court recognized that prior individual suits challenging the same legislation had been dismissed for lack of standing and, as a result, found a sufficient hindrance to the third party's ability to bring suit. *Id.*

Moreover, the underlying principles of *jus tertii* standing have been specifically applied to permit the assertion of the constitutional rights of students within a school district's jurisdiction. *See Baliles,* 829 F.2d at 1310-11 (holding that school board had standing to sue on behalf of students); *Akron Bd. Of Educ.*, 490 F.2d at 1290 (holding

20

that "in terms of loss of . . . tax dollars and in terms of identity of interest with the asserted rights of the pupils and their parents" school board had standing); *Cincinnati City Sch. Dist. v. State Bd. Of Ed.*, 680 N.E.2d 1061 (Ohio App. 1996) (permitting school district to make equal protection challenge on behalf of its students).

> We are mindful of and herein reiterate our long-recognized admonition that
>
> > [t]raditionally, courts have been reluctant to allow persons to claim standing to vindicate the rights of a third party on the grounds that third parties are generally the most effective advocates of their own rights and that such litigation will result in an unnecessary adjudication of rights which the holder either does not wish to assert or will be able to enjoy regardless of the outcome of the case.

*Snyder v. Callaghan*, 168 W. Va. 265, 279, 284 S.E.2d 241, 250 (1981) (citation omitted). Nevertheless, we find it appropriate and necessary to establish a test to evaluate the propriety of a litigant's assertion of the constitutional rights of third parties. As such, we hold that to establish *jus tertii* standing to vindicate the constitutional rights of a third party, a litigant must (1) have suffered an injury in fact; (2) have a close relation to the third party; and (3) demonstrate some hindrance to the third party's ability to protect his or her own interests.

Based upon these factors, we find that the Kanawha County BOE clearly has *jus tertii* standing to advance an equal protection challenge to the school funding statutes on behalf of the students of Kanawha County. First, there can be no question that the Kanawha County BOE has suffered an injury-in-fact by virtue of the mandated

21

library funding obligation established in the Kanawha Special Act and as administered by W. Va. Code § 18-9A-11, which results in a direct and immediate diversion of an annual sum certain from its coffers. Injury in fact is easily established when a litigant demonstrates "a direct, pocketbook injury." *Barrows v. Jackson*, 346 U.S. 249, 256 (1953); *see also Bd. of Natural Resources v. Brown,* 992 F.2d 937, 945 (9th Cir. 1993) (finding "substantial loss of revenues" sufficient to show injury); *City of East Liverpool*, 870 N.E.2d at 712 (finding that "direct injury to [the City's] own treasury" established injury in fact). Secondly, there can be little argument that the Kanawha County BOE has a "close relation" to its students; the entire purpose for which the board exists is to administer and furnish a thorough and efficient education for the benefit of its students.

Finally, we find that sufficient hindrance to the individual students' ability to vindicate their constitutional rights in this instance exists such as to satisfy the requirements of *jus tertii* standing. First, although we acknowledge the ability of an individual student to bring an action challenging the constitutionality of the school funding formula, we likewise recognize the practical obstacles to an individual student or parent's ability to identify inequalities which may be present in the byzantine school funding statutes at issue. The Sixth Circuit discussed similar practical inabilities of individual students or parents to recognize inequalities which create a "minimal present impact" but nevertheless warrant constitutional scrutiny:

> [I]t should be noted that the [allegedly unconstitutional State action] would be much less likely to come to the attention of said parents or arouse their concern than it would to come to

22

> the attention of and arouse the concern of the School Board, which is the immediate object of the [action] alleged to be unconstitutional. Thus if jurisdiction is refused in a precedent-setting case because the potential litigants, alert to the possible constitutional abuse, are denied standing, quite a bit of the unconstitutional camel may be in the tent before the tent's less alert occupants are awakened.

*Akron Bd. of Education,* 490 F.2d at 1289-90.

Moreover, we envision equal difficulty of an individual student or parent in demonstrating injury in fact in support of his or her own standing were an individual attack on the statute at issue launched. In fact, this precise stumbling block came to fruition in *City of East Liverpool,* as discussed hereinabove. The Supreme Court of Ohio found that a hindrance to East Liverpool's citizens existed, noting that an individual citizen taxpayer filed an equal protection lawsuit, only to have it dismissed for lack of standing. *Id.,* 870 N.E.2d at 712. In particular, the court noted that the Seventh District Court of Appeals had dismissed an individual taxpayer suit because it "'merely allege[d] injuries that harm the public generally and have failed to adduce *personal* injuries caused by the statute.'" *Id.* (emphasis added).

As the Library makes repeated note in its brief, although the annual diversion of funds to the Library is frequently in excess of $2 million, this amount makes up but approximately one percent of the Kanawha County BOE's budget. Were an individual student required to demonstrate a direct, *personal* injury-in-fact as the result of this diversion of funds, it would certainly prove difficult, if not impossible. However, we

23

are quick to note that the difficulty in one individual student demonstrating the detrimental effect on his or her own individual educational opportunities for purposes of establishing standing does not in any degree speak to the validity of the equal protection challenge being made. Rather, it reflects only the practical inefficacy of requiring an individual to vindicate the rights of an entire student populous. As such, we believe that a sufficient hindrance exists to the ability of the Kanawha County student body population to assert the equal protection challenge made on its behalf by the Kanawha County BOE such as to warrant finding of *jus tertii* standing.

Accordingly, we find that the circuit court committed no reversible error in its determination that the Kanawha County BOE has standing to advance the claims set forth in the case *sub judice*.[16]

**B.**

***Prematurity of Summary Judgment***

We turn next to the issue of whether the circuit court erred in granting summary judgment prematurely. Both the Library and West Virginia BOE contend that additional discovery was needed to establish the compelling state interest which would warrant any unequal classification in the statute and that therefore, entry of summary

---

[16] Having properly determined the existence of *jus tertii* standing, we find it unnecessary to address the issue of whether the Kanawha County BOE has first-party standing.

judgment was premature. No affidavit pursuant to W.V.R.C.P. 56(f) was filed; the Library merely indicated that discovery was needed in its response to the motion for summary judgment. The West Virginia BOE requested no additional discovery.

In Syllabus Point 1 of *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.,* 196 W. Va. 692, 474 S.E.2d 872 (1996) this Court held, in pertinent part, that if a party does not file an affidavit under W.V.R.C.P. 56(f) demonstrating the need for additional discovery before summary judgment is considered, the party must provide a written request for additional discovery which:

> [a]t a minimum . . . satisf[ies] four requirements. It should (1) articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet become accessible to the party; (2) demonstrate some realistic prospect that the material facts can be obtained within a reasonable additional time period; (3) demonstrate that the material facts will, if obtained, suffice to engender an issue both genuine and material; and (4) demonstrate good cause for failure to have conducted the discovery earlier.

This case was pending for three years and no party conducted any discovery in this high-profile litigation. In fact, the case was pending for approximately a year and a half after the Library indicated in its brief in opposition to summary judgment that additional discovery was needed and yet still no discovery was conducted. With regard to the above-factors, the Library merely stated in its brief that it "intends to engage in proper discovery to garner specific evidence of the compelling state interest served by libraries." However, the case was pending for nearly nine months after the Kanawha

25

County BOE filed its motion for summary judgment, ostensibly revealing the issues upon which the Library contends "proper discovery" was necessary, yet no discovery was conducted. Moreover, the Library's broad statement that it intends to conduct "proper discovery to garner specific evidence" is wholly insufficient. The Library offered no specifics about what type of evidence it hoped to uncover that was not otherwise available to it, the prospective time period in which it anticipated the discovery to be obtained or, critically, any justification for why it had not already occurred.

Although this Court alleviated the formalistic requirement of the filing of an affidavit pursuant to W.V.R.C.P. 56 in *Powderidge*, we made clear that "[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment[.]" 196 W. Va. at 702, 474 S.E.2d at 882 (quoting *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995)). Certainly the requirements set forth in *Powderidge* for a written request for additional discovery were not even dignified by the Library, much less satisfied. In this regard, this Court has found that "'the [circuit court] does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past.'" *Id.* (quoting *California Union Ins. Co. v. American Diversified Sav. Bank*, 914 F.2d 1271, 1278 (9th Cir. 1990)).

The West Virginia BOE, while noting that it did not request additional time for discovery below, posits a companion argument to this assignment of error. Specifically, it argues that entry of summary judgment in absence of a Scheduling Order

26

setting forth a timeframe for conducting discovery was erroneous, citing Syllabus Point 2

of *Caruso v. Pearce*, 223 W.Va. 544, 678 S.E.2d 50 (2009):

> Rule 16(b) of the West Virginia Rules of Civil Procedure [1998] requires active judicial management of a case, and mandates that a trial court "shall . . . enter a scheduling order" establishing time frames for the joinder of parties, the amendment of pleadings, the completion of discovery, the filing of dispositive motions, and generally guiding the parties toward a prompt, fair and cost-effective resolution of the case.

We find that this argument implicates the same lack of diligence discussed above.

First, we note the West Virginia BOE does not identify specific discoverable and *relevant* material that a Scheduling Order would have provided a timeframe for obtaining, nor does it indicate how the absence of a Scheduling Order precluded discovery of this allegedly "critical information." [17] Secondly, and more importantly, we find that *Caruso* does not stand for the proposition that entry of summary judgment is *per se* erroneous prior to entry of a Scheduling Order. In fact, we noted, "[a] failure by a judge to issue a scheduling order as required by Rule 16 generally is not deemed by appellate courts sufficient grounds, by itself, for any significant relief." 223 W. Va. at 549, n.3, 678 S.E.2d 55, n.3 (quoting James Wm. Moore, 3 *Moore's Federal*

---

[17] The West Virginia BOE points to the volume of information contained in the amicus briefs regarding the "role of public libraries in educating both students and their parents" as illustrative of the type of information that was "undeveloped." However, clearly this type of information was peculiarly within the control of the Library itself, which offered no such information by way of affidavit in opposition to summary judgment. More importantly, however, as discussed *infra*, the importance and value of the services and educational information provided by libraries is neither disputed nor dispositive of the equal protection analysis.

*Practice, 3d Edition* § 16.10[2] (2007)). Moreover, to construe *Caruso* as affording relief to a party who, in the face of a summary judgment motion, blatantly neglects to do any discovery and then relies on the absence of a scheduling order to survive summary judgment would serve to wholly invalidate the requirements of Rule 56 and *Powderidge* regarding a party's obligations when asserting the need for additional discovery in opposing summary judgment. Our holding in *Caruso* that entry of a Scheduling Order is mandated by the Rules of Civil Procedure was, as plainly set forth in the opinion, intended to *facilitate* the "'swift, inexpensive and just resolution of litigation'"; it was not intended to be used as a weapon by dilatory parties to create a barrier to resolution of cases on their merits. *Caruso*, 223 W. Va. at 548, 678 S.E.2d at 54. Unlike *Caruso*, the parties in this case engaged in a focused and expedient narrowing of the legal issues presented and actively moved the case forward toward resolution. Petitioners fully engaged in that progression with the filing of motions and briefs, but issued not a single discovery request nor conducted a single deposition. In a half-hearted attempt to *delay* disposition by summary judgment, the Library tersely mentioned that it "intended" to conduct discovery; the West Virginia BOE did not so much as even hint at the need for discovery. Accordingly, we do not find the circuit court's entry of summary judgment to have been premature under the facts and circumstances presented.

**C.**

*Equal Protection*

We begin our review of the constitutionality of W. Va. Code § 18-9A-11 by reiterating the fundamental principles which guide our analysis:

> "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. . . ." Syllabus Point 1, *Appalachian Power Co. v. Gainer*, 149 W. Va. 740 143 S.E.2d 351 (1965).

Syl. Pt. 2, in part, *Hartley Hill Hunt Club v. Cnty. Comm'n. of Ritchie Cnty.*, 220 W. Va. 382, 647 S.E.2d 818 (2007).

As this holding connotes, this Court clearly has the "authority and responsibility to review legislative and administrative attempts to alter what are alleged as constitutional mandates." *Randolph Co. Bd. of Educ. v. Adams*, 196 W. Va. 9, 24, 467 S.E.2d 150, 165 (1995). That the statute at issue is subject to equal protection analysis is fairly self-evident by virtue of the precedessor litigation and our holding in *Board I*. Nonetheless, the Library makes many broad pronouncements about the plenary power of the Legislature and the implications to sovereignty created by a constitutional challenge to legislation by a subordinate, legislatively-created, "mere subdivision" of government. Petitioners' arguments suggest that this "back-and-forth" between this Court and the

29

Legislature is merely a battle of wills in which the principles of sovereignty dictate the Legislature the victor.[18] However, this is not the first occasion this Court has entertained such sabre-rattling.

Nearly thirty-five years ago, this Court was faced with similar arguments in *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979), and extensively discussed, with approval, "jurisdictions [which] have not hesitated to examine legislative performance of the [thorough and efficient education] mandate, and we think properly so, even as they recite that courts are not concerned with the wisdom or policy of the legislation." *Id.* at 691, 255 S.E.2d at 870. We found it proper that these jurisdictions had "intervened when an act by a legislature or a proceeding by a local school board, as agent of the legislature, is offensive to judicial notions about what a thorough and efficient education system is." *Id.* at 693, 255 S.E.2d at 871. Years later, this Court again squarely addressed the purported "tension" between the judicial and legislative branches when we were called upon to assess the constitutionality of certain enactments which were alleged to infringe upon constitutional rights. In *Adams*, 196 W. Va. at 24, 467 S.E.2d at 165, this Court stated:

---

[18] Petitioners ominously declare that if this Court accepts the arguments of respondent, then it will have "destroyed the Legislature's constitutional power and responsibility over education" and "assum[ed] a new constitutional function." In that event, petitioners accuse this Court of enabling Chief Justice Burger's concern that "modern governmental programs have self-perpetuating and self-expanding propensities." *Lemon v. Kurtzman*, 403 U.S. 602, 624 (1971).

It cannot be denied that of the various structural elements in the Constitution, judicial review allows the judiciary to play a role in maintaining the design contemplated by the framers. . . . [J]udicial review has been established beyond question, and although we may differ in applying its principles, its legitimacy is undoubted.

Finally, we observe that similar arguments regarding legislative plenary power over education were advanced and rejected by the United States Supreme Court in *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982). The appellants in *Seattle School District* argued in defense of the constitutionality of a desegregation statute, contending, like the petitioners herein, that "the State necessarily retains plenary authority over Washington's system of education, and therefore [the offending legislation] amounts to nothing more than an unexceptional example of a State's intervention in its own school system." *Id.* at 475-76. While acknowledging that "States traditionally have been accorded the widest latitude in ordering their internal governmental processes," the Supreme Court stated that "'insisting that a State may distribute legislative power as it desires . . . furnish[es] no justification for a legislative structure which otherwise would violate [equal protection].'" *Id.* at 476 (quoting *Hunter v. Erickson*, 393 U.S. 385, 392 (1969)). The Court astutely noted that "[t]he issue here, after all, is not whether Washington has the authority to intervene in the affairs of local school boards; it is, rather, whether the State has exercised that authority in a manner consistent with the Equal Protection Clause." *Id.*

This Court has unquestionably found that education is a fundamental right: "The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State." Syl. Pt. 3, *Pauley*. Consistent with its responsibility and authority to ensure that the fundamental right of education is protected, this Court has expressly recognized that the Legislature's power in the realm of educational funding is necessarily constrained by equal protection principles and must withstand strict scrutiny:

> Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification.

Syl. Pt. 4, *Pauley*. We reiterated in this case's predecessor litigation that "[a] statute that creates a lack of uniformity in the State's educational financing system is subject to strict scrutiny, and this discrimination will be upheld only if necessary to further a compelling state interest." Syl. Pt. 4, *Board I*. It is, obviously, this precise holding that is once again implicated by virtue of the underlying challenge to the amendment to W. Va. Code § 18-9A-11.

Accordingly, it is evident that the legislative response to *Board I*, by way of amendment to W. Va. Code § 18-9A-11, is not impervious to constitutional scrutiny any

32

more so than the pre-amendment statutory scheme addressed in *Board I*.[19]  Moreover, this Court's authority and responsibility to exercise its proper constitutional powers of judicial review is evident.

## 1. Unequal Treatment

Having determined that the educational financing statute at issue, as amended, is unquestionably subject to equal protection scrutiny, we proceed to the crux of the parties' arguments.  The Library contends that the mandated diversion of funds from the Kanawha County BOE's regular levy receipts does not constitute an inequality in the school financing system.[20]  Specifically, the Library adamantly argues that by virtue of the Legislature's amendment to W. Va. Code § 18-9A-11 to include the finding that libraries serve a "legitimate school purpose," the equal protection violation found in *Board I* was cured.  In addition, the Library contends that the mandatory library funds are not being diverted away from education; rather, education is simply being "doled out" through both the school system and the library, which merely creates a "spending"

---

[19] In fact, this is not the first occasion this Court has had to engage in a review of amendments to a school financing statute which we had previously found unconstitutional.  *See Bailey*, 192 W. Va. 534, 539, 453 S.E.2d 368, 373 (1994) (holding that amendments to W. Va. Code § 18A-4-5 merely resulted in a "continuation of the inequities" identified in original statute struck down in predecessor litigation).

[20] It should be noted, however, that counsel for the Library ultimately conceded in oral argument before this Court that an inequality did, in fact, exist and that the sole issue presented is simply whether such inequality was necessary to further a compelling state interest.  Regardless, the Court finds it proper to give full treatment to all facets of the equal protection issue.

inequality and not a "funding" inequality. The respondent counters that, quite simply, the Kanawha County BOE is being treated differently than forty-six non-Special Act county boards of education which are free to utilize their discretionary retainage as they see fit and/or whose excess levies are unencumbered by a library obligation.

We first address the petitioners' misapprehension of our holding in *Board I*. Petitioners posit that this Court concluded that W. Va. Code § 18-9A-12 violated equal protection "only because" a portion of the county board's local share was used to support a "non-school purpose" and that, given the Legislature's findings of fact that libraries serve a legitimate school purpose, "there can be no equal protection or other constitutional violation." Initially, we note that this argument accords the separation of powers set forth in Section 1, Article V of the West Virginia Constitution very little veneration. Were constitutional infirmity so easily rectified with simple legislative "sleight of hand," there would be little point in this Court undertaking the exercise of judicial review. And although we believe that clearly the Legislature found the "non-school purpose" language in *Board I* worthy of attention, we do not believe even the Legislature thought the equal protection violation so easily negated; otherwise, it certainly would not have undertaken the more significant alterations to the statute to shift the funding obligation to receipts which were not implicated in the local share.

Our decision in *Board I* was not predicated on the fact that the library funding obligation was a non-school purpose, notwithstanding the references thereto in

34

the opinion. Rather, both the standard applied in *Board I* and our holding make plain that it was the lack of uniformity that created the equal protection violation: "A statute that creates a lack of uniformity in the State's educational financing system is subject to strict scrutiny[.]" Syl. Pt. 4, in part, *Board I*. It was the mere fact of the disparate treatment of Kanawha County which was the essence of the equal protection violation found—not the nature, quality or type of the disparate treatment.[21] After finding no justification for the unequal treatment, we concluded that "W. Va. Code § 18-9A-12 (1993) . . . violates equal protection principles *because it operates to treat county school boards* required by law to provide financial support to non-school purposes *less favorably* than county school boards with no such requirement." Syl. Pt. 6, in part, *Board I* (emphasis added).[22]

---

[21] At the time of *Board I* (prior to the legislative findings of fact that libraries serve legitimate school purposes), the fact that public libraries were characterized by this Court as a "non-school purpose" clearly did serve to *highlight* the lack of uniformity found therein. This characterization did not, however, establish the outer boundaries of the lack of uniformity.

[22] In that regard, not only does Syllabus Point 6 of *Board I* set forth the basis of the equal protection violation occasioned by W. Va. Code §18-9A-12, but in its language, fairly read, appears to suggest a statutory "fix" to the equal protection violation. The syllabus point states the statute violates equal protection "to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose . . ." *Id.* An increase in the county's State share equivalent to the funding obligation was apparently the Kanawha County BOE's suggested remedy to the disparate treatment. *Id*. at 805, 639 S.E.2d at 897.

This aspect of Syllabus Point 6 of *Board I* raises concern. Although it is well within the province of this Court to make a judicial determination that a statute is unconstitutional, as discussed *supra*, it is not for this Court to suggest a particular (continued . . .)

35

As such, to assert that the legislative finding that libraries serve a "legitimate school purpose" in and of itself cures the constitutional infirmity demonstrates an overly simplistic reading of *Board I*. We find that whether the diversion of funds is for a school purpose is not dispositive of the issue as to whether there is unequal treatment; as such, the legislative findings do little to advance the analysis. The issue is whether the amendments to W. Va. Code § 18-9A-11 continue to create a lack of uniformity in the educational financing system.

To that end, this Court finds that the fact that the Kanawha County BOE is being treated differently than forty-six other counties by virtue of its mandatory library funding obligation is fairly manifest, notwithstanding the Legislative amendments. The non-Special Act counties may utilize their discretionary retainage for any purpose which they see fit and proper; Kanawha County's discretionary retainage is encumbered to the extent of the funding obligation. Moreover, the option of transferring the obligation to

legislative remedy. Such an act would be in the nature of an impermissible advisory opinion inasmuch as it suggests, in advance of an actual justiciable controversy, the constitutionality of a legislative act: "Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes." Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991). Although a small minority of states, either by statute or constitutional provision, require or permit their courts to render advisory opinions on pending legislation, our State does not. *See* Jonathan D. Persky, *"Ghosts That Slay": A Contemporary Look at State Advisory Opinions,* 37 Conn. L. Rev. 1155 (2005). We note further the West Virginia BOE's contention, that even if the Legislature had undertaken such an amendment, the amendment would necessarily violate equal protection principles as well, because only the nine Special Act counties would have both a levy-funded library *and* an increased State share.

the excess levy does nothing to alleviate the disparate treatment. The non-Special Act counties are not set with the Hobson's choice of choosing to deplete their discretionary retainage to satisfy the library funding obligation or risking the failure of their excess levy and the educational "extras" it affords by placing a large library funding line item on the ballot.[23]

Furthermore, we find no merit in the petitioners' attempt to recast the library funding obligation as a "spending" inequality as opposed to a "funding" inequality. The Library suggests that so long as "total funding actually received" for "education" by Kanawha County (whether through the school system or the library) is "constitutionally sufficient," the Legislature may direct spending. However, the Library provides no support for the notion that a mere "spending" disparity occasioned by a statute within the educational financing system would not and does not create an equal protection problem. It scarcely matters if counties are uniformly funded if the State can then discriminate against local boards' spending in a manner that is not demonstrated to be necessary to further a compelling state interest. Certainly nothing in our precedents would suggest that such an act of the Legislature would somehow be immune from equal

---

[23] The West Virginia BOE contends that the concern that the excess levy will fail because of the inclusion of the library funding merely creates a "political problem" rather than an "equal protection" problem. Although a clever spin on the inescapable political implications of the issues presented, we find that making critical excess levy funds the potential "sacrificial lamb" only further illustrates the disparate treatment between Kanawha and non-Special Act counties.

protection scrutiny, to the extent such an act creates the critical "lack of uniformity" in the educational financing system.

Moreover, the Library asserts that this Court has previously determined that mere funding disparities do not implicate equal protection concerns. Citing our decision in *State ex rel. Bd. of Educ. v. Chafin*, 180 W. Va. 219, 376 S.E.2d 113 (1988), the Library contends that insofar as students are not being deprived of a "thorough and efficient" education, inequalities that result in a county's budget are not subject to equal protection scrutiny. This interpretation of *Chafin* is squarely at odds with both *Pauley* and *Board I* wherein we held that *any* lack of uniformity in the school financing scheme must withstand the strict scrutiny analysis implicated by the potential equal protection violation. Moreover, our decision in *Chafin* was premised not on a lack of constitutional concern regarding funding disparities, but by the absence of State action, which foreclosed the funding disparities from an equal protection challenge. The funding disparity at issue was occasioned by excess levies, which we found exempt from equal protection scrutiny because they were "expressly countenanced by W. Va. Const. art. X, § 10 [and] represent the initiative of individual counties whose residents are willing to tax themselves to improve the level of local education." *Id*. at 227, 376 S.E.2d at 121.[24]

---

[24] *See also Pauley*, 162 W. Va. at 712, 255 S.E.2d at 880 (citations omitted) ("The violation of the equal protection standard usually arises from state action; that is, the act of a legislative body in setting, by some statute or ordinance, an arbitrary classification. Here, these excess levies are determined by the vote of the people.")

Moreover, the narrow view that the only constitutional issue implicated in the school financing scheme is whether students are being denied a "thorough and efficient" education was previously rejected in *Manchin,* 179 W. Va. 235, 366 S.E.2d 74. In *Manchin*, this Court found that W. Va. Code § 18A-4-5 (1985) violated equal protection because it treated counties which had never passed excess levies more favorably than those which had excess levies which were not continued, with respect to salary equity funds. We contrasted equal protection challenges which implicated the "thorough and efficient" clause with those which were more concerned with invidious classifications which may be created by the school funding statutes:

> In *Pauley*, the Court primarily concentrated on equal protection violations with respect to the "thorough and efficient" clause of the state constitution. . . . In the case now before us, we look to this constitutional mandate as well; however, our focus also involves a more traditional equal protection analysis: a case of disparate treatment. . . . This challenge is before this Court because the legislature has created, by enacting *W. Va. Code*, 18A-4-5 [1985], an arbitrary classification which we recognized in *Pauley* as actionable under equal protection principles.

*Id*. at 240, n.8, 366 S.E.2d at 748, n.8.

Accordingly, we find that the amendments to W. Va. Code § 18-9A-11 continue to treat the Kanawha County BOE less favorably with respect to its discretionary retainage and/or excess levy funds than other non-Special Act counties and, therefore, continue to create a lack of uniformity in the State's educational financing

39

system which is subject to strict scrutiny review and may stand only upon demonstration that such lack of uniformity is necessary to further a compelling state interest.

## 2. *Justification of the Unequal Treatment*

Having determined that a lack of uniformity continues to exist notwithstanding the amendments to W. Va. Code § 18-9A-11, the sole issue remaining is whether petitioner can "demonstrate some compelling State interest to justify the unequal classification." Syl. Pt. 4, in part, *Pauley*. Although petitioners argue the importance of libraries as education and the Legislative findings that libraries serve a "legitimate school purpose," at no time do they articulate how the unequal treatment occasioned by W. Va. Code § 18-9A-11 is "*necessary* to further" a compelling state interest. Syl. Pt. 4, in part, *Board I* (emphasis added). It is particularly unedifying to simply assert that libraries serve important state interests and that obviously, the funding of libraries furthers this interest. The question, more pointedly, asks why it is *necessary* that the Kanawha County BOE be treated differently than other county boards of education--which counties have libraries of their own but their boards of education are not required to contribute to their funding--*in order to further* the compelling state interest of "libraries as education." It is incumbent upon petitioners, in defense of the statute, to provide some justification for the unequal treatment of Kanawha County and they have failed to do so. Consequently, this failure is fatal to their defense of W. Va. Code § 18-9A-11.[25] *See*

---

[25] The West Virginia BOE posits that, rather, it was the Kanawha County BOE which failed in its burden before the circuit court. In particular, the West Virginia BOE (continued . . .)

*Manchin*, 179 W. Va. at 241, 366 S.E.2d at 749 (finding that failure to "articulate any specific facts that would justify [] disparate treatment" fatal to claim).

In fact, petitioners' insistence on beating the drum of "libraries are education" and attempts to illustrate that libraries are integral to our system of education merely begs the question as to why, if so, are forty-six other counties not required to divert funds in support of their libraries?  Petitioners offer no rationale as to why in only nine specified counties is it necessary to divert school board monies for furtherance of this compelling state interest.[26]  As previously observed by Justice Davis in *Board I*, this Court does not dispute in any measure the value of the public library system and its role as an augment to education; it is, once again, quite simply not the issue: "The viability of public libraries, however, is neither the issue presented for resolution in this case nor the

---

contends that the Legislature created a "factual test" for determining whether a particular library serves a "legitimate school purpose" by virtue of the following language:  "To the extent that public schools recognize and choose to avail the resources of public libraries toward developing within their students such legally recognized elements of a thorough and efficient education . . . public libraries serve a legitimate school purpose[.]"  W. Va. Code § 18-9A-11(f).  The West Virginia BOE argues that before an equal protection challenge may be asserted, a Special Act library must prove that it does *not* avail itself of the resources of the public library and that the Kanawha County BOE failed to do so.  However, we find that this argument is merely a thinly-veiled attempt to improperly shift the burden of proof to the Kanawha County BOE to disprove what the petitioners contend is the justification of the discriminatory classification.

[26] This Court can discern no rationale as to why the nine Special Act counties were subjected to the Special Acts, nor any particular similarities between them as pertains to their public libraries or schools.  Nor, however, is it proper for this Court to speculate about any theoretical common thread in an effort to uncover the justification for the unequal classification.

41

reason for or result of the decision reached by the majority of the Court." *Board I,* 219 W. Va. at 811, 639 S.E.2d at 903 (Davis, J., concurring). Petitioners' insistence that the respondent's argument disregards the Legislature's findings regarding the value of libraries in our educational system reflects petitioners' failure to identify the critical inquiry in defense of the equal protection challenge. Petitioners have, once again, failed in their burden before the circuit court and this Court to provide a justification for the disparate treatment of the Special Act counties; no such justification was provided in 2006 when *Board I* was decided and seven years later, this Court is still awaiting an articulable justification as to why these particular nine counties are being treated differently and why such disparate treatment is necessary to further a compelling state interest.

Furthermore, to the same extent that the vitality of public libraries and their role in education are non-dispositive of the equal protection analysis, the amount of the diversion of school board funds is similarly immaterial. Both petitioners and, in particular, the *amici*, focus heavily on the fact that mandated spending on the Kanawha County Public Library is approximately one percent of the Kanawha County BOE's total budget; they note that in other Special Act counties, the spending is less than one percent. They argue, in contrast, that the Kanawha County BOE's funding of the Library is forty percent of the total library budget and that loss of such funding would deal a "striking blow to the state due to the sheer size of the population this library directly serves." The Court is not unsympathetic to the potential financial hardship occasioned by the finding

that the statute is unconstitutional. However, "[s]trangling constitutional mandates in favor of budgetary constraints accords neither with the spirit nor the letter of the West Virginia Constitution." *Adams,* 196 W. Va. at 21, 467 S.E.2d at 162. As Justice Cleckley wisely observed,

> Section 1 [of Article XII] necessarily exerts pressure on our Legislature and boards of education to make hard—and sometimes undesirable—decisions while staying within constitutional limitations. Thus, we are compelled to underscore that financial hardship is an insufficient basis for ignoring the West Virginia Constitution. The imposition of these difficult choices is an inevitable and unavoidable attribute that emanates from our Constitution.

*Id.* at 23, 467 S.E.2d at 164.[27]

Accordingly, we hold that W. Va. Code § 18-9A-11 (2008), as amended, to the extent that it creates a lack of uniformity in the educational financing system by requiring counties set forth in W. Va. Code § 18-9A-11(g)(1) through (9) to pay their respective "Special Act" mandatory library funding obligations from their discretionary retainage or transfer the obligation to their excess levies, violates equal protection and is therefore, unconstitutional and unenforceable.[28]

---

[27] *See Bailey,* 192 W. Va. at 539, 453 S.E.2d at 373 (stating that "the fact that the [] amendments limit the inequity to one year does not eliminate our equal protection concerns").

[28] Having determined that W. Va. Code § 18-9A-11 is unconstitutional under equal protection principles, we find it unnecessary to further address whether it violates Article XII, § 5 and Article X, § 1b of the West Virginia Constitution. *See Perdue v.* (continued . . .)

## D.

### *Validity of the Kanawha Special Act*

Finally, the Library argues that the circuit court exceeded the relief requested in the complaint by declaring that not only was W. Va. Code § 18-9A-11 unconstitutional, but also the Kanawha Special Act itself. The circuit court's order states, in pertinent part, that

> the Kanawha Special Act and Section 18-9A-11 of the Code, *to the extent* they require the Kanawha Board to divert a portion of its regular levy receipts for the support of the Kanawha Library, or to transfer the Kanawha Board's library funding obligation to its excess levy revenues, by and hereby are null and void and of no force and effect."

(Emphasis added). The complaint requests a declaration "that W. Va. Code § 18-9A-11 and related provisions of the West Virginia Code, *as interpreted and applied by the defendants, in combination with the Special Act"* is unconstitutional. (emphasis added). The Library argues that the Kanawha Special Act has been previously upheld as constitutional by this Court in *Kanawha County Public Library v. The County Court of Kanawha County,* 143 W. Va. 385, 102 S.E.2d 712 (1958), and was not at issue in the instant litigation; otherwise, it would have been made an original party to the action rather than finding it necessary to intervene. Respondent argues generally that West

---

*Wise,* 216 W.Va. 318, 323, n.19, 607 S.E.2d 424, 429, n.19 (2004) (finding it unnecessary to address additional assignments of error after determining unconstitutionality of "Pension Liability Redemption Act"); *State ex rel. Daily Mail Pub. Co. v. Smith,* 161 W.Va. 684, 690-91, n.3, 248 S.E.2d 269, 272, n.3 (1978) (finding it unnecessary to address additional constitutional challenges after finding statute unconstitutional on First Amendment grounds).

Virginia is a "notice pleading" state and that the parties had fair notice that the Kanawha Special Act was implicated in the declaratory judgment action. Respondent argues further that the Kanawha Special Act and W. Va. Code § 18-9A-11 work in conjunction with one another by virtue of reference to the Special Acts in the amendment to W. Va. Code § 18-9A-11. Neither party addresses the central issue of what the net effect is of the circuit court's inclusion of the Kanawha Special Act into the order.

We find that this assignment of error lacks substantial merit. First, it is clear from the circuit court's language that the Kanawha Special Act has only been invalidated to the extent of the Kanawha County BOE's library funding obligation; the Kanawha County Commission and City of Charleston obligations remain intact. Moreover, it is clear that the Special Act, which is the Act which triggers the funding obligation in the first instance, was always in contention in the underlying declaratory judgment action. The complaint, fairly read, seeks a declaration regarding Section 11 as interpreted and applied "in combination with" the Kanawha Special Act. The circuit court's order effectuates precisely that--rendering unconstitutional and unenforceable the interdependent portions of the Kanawha Special Act and W. Va. Code § 18-9A-11 "to the extent" of the Kanawha County BOE's library funding obligation. Finally, we find that inasmuch as the Kanawha County BOE was not a party to *Kanawha County Public Library* and, as a result, the Court did not address the constitutionality of the Kanawha Special Act under the principles applied below and as analyzed herein, the circuit court's

45

ruling as pertains to the Kanawha County BOE's funding obligation under the Kanawha

Special Act was not constrained by *Kanawha County Public Library*.[29]

Therefore, we find no error in the language of the order of the circuit court

and likewise hold that Chapter 178 of the Acts of the Legislature, Regular Session, 1957

(also known as the "Kanawha Special Act"), insofar only as pertains to the obligation of

the Kanawha County Board of Education to divert a portion of its regular or excess levy

---

[29] In *Kanawha County Public Library,* the Library sought a writ of mandamus to require the Kanawha County Court (now known as the Kanawha County Commission) to turn over to the Kanawha County BOE sums collected pursuant to the levy for the support of the Library such that the Kanawha County BOE could fulfill their funding obligation to the Library. 143 W. Va. at 386, 102 S.E.2d at 713. The Kanawha County Commission made multiple challenges to the Kanawha Special Act, although its main argument was that the Special Act violated Article VI, Section 39 which prohibits special legislation: "[I]n no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case[.]" *Id.* at 388, 102 S.E.2d at 714. Citing a litany of cases which turned on whether the special legislation interfered with the "fiscal affairs" of government or whether a general law was unfeasible or impracticable, the Court found that the Kanawha Special Act did not "deprive the County of Kanawha of funds necessary to meet the expenses of [the] mandatory functions of government" and therefore did not violate Article VI, Section 39. *Id*. at 399, 102 S.E.2d at 720. The Court further noted that a general law would be impractical because "[i]n many of the counties, there is no public library." *Id*. at 391, 102 S.E.2d at 716.

The challenger to the Special Act in *Kanawha County Public Library* was the Kanawha County Commission; the funding obligation as pertained to both the City of Charleston and Kanawha County BOE was not squarely at issue, as acknowledged by the Court: "The other two units of local government affected by the act are not parties to this litigation." *Id*. at 393, 102 S.E.2d at 717. Similarly, the constitutionality of the Kanawha Special Act as pertains to the two remaining governing authorities—the City of Charleston and Kanawha County Commission—is not presently before this Court and therefore continues to be governed by *Kanawha County Public Library*.

receipts to the Kanawha County Public Library Board, is unconstitutional and unenforceable.

## IV. CONCLUSION

Therefore, for the reasons set forth hereinabove, the Court affirms the July 28, 2011 and September 27, 2011, orders of the Circuit Court of Kanawha County, West Virginia.

Affirmed.