FILED

**November 17, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-616—*State of West Virginia, et al., v. Travis Beaver, et al.*

Hutchison, Chief Justice, dissenting:

This Court has the "responsibility and authority to ensure that the fundamental right of education is protected[.]" *Kanawha Cnty. Pub. Libr. Bd. v. Bd. of Educ. of Cnty. of Kanawha*, 231 W. Va. 386, 402, 745 S.E.2d 424, 440 (2013). Because the Court's opinion finding the Hope Scholarship Act constitutional is contrary to the mandates of the West Virginia Constitution and the decisions of this Court which have jealously guarded the right to a free public education, I must respectfully dissent.

### A. The Hope Scholarship Program.

The Hope Scholarship Act creates one of the most expansive school voucher programs in the United States. As the circuit court correctly found, "[t]here is no limitation on eligibility based on geography, family income, school performance, of the particular educational needs of the student, and no cap or limit on the number of vouchers that can be given out." Under the program, a student receives a payment of public money to subsidize private school tuition or pay for other private education or homeschooling expenditures. The Legislature funds this program through general revenue. W. Va. Code § 18-9A-25 (2021). The State Treasurer transfers the funds to the Department of Education (the "Department"), *id*. § 18-31-6, that in turn transfers the fund to a newly created Hope Scholarship Board. *Id*. § 18-9A-25. The Department transfers to the Hope Scholarship Board an amount "equal to 100 percent of the prior year's statewide average net state aid

1

share allotted per pupil based on net enrollment adjusted for state aid purposes[.]" W. Va. Code § 18-9A-25; *id*. § 18-31-6(b).[1] The Hope Scholarship Board then places the money in accounts for parents referred to as Education Savings Accounts or ESAs. *Id*. § 18-31-5. To be eligible for the program during its first three years of operation, applicants must be enrolled in a public school for forty-five days at the time of application and remain so enrolled until an award letter is issued by the Hope Scholarship Board; have been enrolled in a public school for the previous year; or be eligible for enrollment in a kindergarten program. *Id*. § 18-31-2(5). If, on July 1, 2026, the program's participation rate is less than five percent of public-school enrollment for the previous school year, then *any* West Virginia child of public-school age becomes eligible for the program. *Id*. § 18-31-2(5)(B).

## B. Education is an essential right and an indispensable duty of State Government.

Education serves two vital and interrelated interests.

First, as a personal matter, education is indispensable to our youth succeeding in an ever developing and more complex world. "Education is the foundation for success at any level. For a citizen to succeed in life, a good education is vital." Jennifer M. Emswiler, *Leadership of West Virginia's Education System Enhanced with West Virginia Lawyers*, W. Va. Law., Aug. 2002, at 18, 21. "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he or [she] is denied the opportunity of an education." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954). In fact, "[t]his Court has

---

[1]That formula currently provides Hope Scholarship applicants $4,300.

unquestionably found that education is a fundamental right[.]" *Kanawha Cnty. Pub. Libr. Bd.,* 231 W. Va. at 402, 745 S.E.2d at 440; *Randolph Cnty. Bd. of Ed. v. Adams*, 196 W. Va. 9, 17 n.10, 467 S.E.2d 150, 158 n.10 (1995) (noting "the vast body of case law in this jurisdiction that not only emphasizes the fact that education is important, but is a fundamental right in this jurisdiction.").

Second, while individual students have a compelling interest in being educated, there is an equally compelling societal interest in having an educated citizenry. "[Education] is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship." *Brown,* 347 U.S. at 493. "Every man in a county, a town, a city, or a State is deeply interested in the education of the children of the community, because his peace and quiet, his happiness and prosperity, are largely dependent upon the intelligence and moral training which it is the object of public schools to supply[.]" *Kelly v. City of Pittsburgh*, 104 U.S. 78, 82 (1881). Rightly, "Americans regard the public schools as a most vital civic institution for the preservation of a democratic system of government." *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring). Consequently, "[p]roviding public schools ranks at the very apex of the function of a State." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

The founders of West Virginia also recognized that "[e]ducation is the cornerstone of our society." *Cobb v. West Virginia Hum. Rts. Comm'n*, 217 W. Va. 761,

3

775, 619 S.E.2d 274, 288 (2005). "The framers of our [West Virginia] Constitution lived among the ruins of a system that virtually ignored public education and its significance to a free people." *Adams*, 196 W. Va. at 15, 467 S.E.2d at 156. As we have explained:

> "Virginia's failure to provide a system of free public education had long rankled the western counties, and when the convention met in 1861 to create West Virginia's first constitution, the framers gave high priority to public education (1863 Const. Art. X). The 1872 convention delegates, for all their conservative leanings, actually strengthened the education article. 'Article XII . . . and Article X, § 5. . . give a constitutionally preferred status to public education in this State.'" Robert M. Bastress, *The West Virginia Constitution— A Reference Guide* 271 (1995), quoting *West Va. Educ. Ass'n v. Legislature*, 179 W. Va. 381, 382, 369 S.E.2d 454, 455 (1988).

*Id*., 467 S.E.2d at 156.

Thus, "[o]ur Constitution manifests, throughout, the people's clear mandate to the Legislature, that public education is a *prime* function of our State government." *Pauley v. Kelly*, 162 W. Va. 672, 719, 255 S.E.2d 859, 884 (1979). The West Virginia Constitution provides, for example, "[t]he Legislature shall provide, by general law, for a thorough and efficient system of free schools." W. Va. Const. Art. XII, § 1. It also provides, "[t]he power of taxation of the Legislature shall extend to provisions for the payment of the state debt, and interest thereon, the support of free schools . . . ." *Id*. Art. X, § 5. "The provisions of Article XII, Section 1 *et seq.*, as well as Article X, Section 5 of the West Virginia Constitution, when construed in the light of our prior cases, gives a constitutionally preferred status to public education in this State." Syl. Pt. 1, *State ex rel.*

4

*Bd. of Ed. v. Rockefeller*, 167 W. Va. 72, 281 S.E.2d 131 (1981). The majority opinion denies public education the preferred status to which it is entitled under our Constitution. Such a denial requires my dissent.[2]

**C. West Virginia Constitution Articl e XII, § 1: A mandate with a restriction.**

"Inasmuch as the Constitution of West Virginia is a restriction of power rather than a grant of power, as is the federal Constitution, the Legislature may enact any measure not interdicted by that organic law or the Constitution of the United States." Syl. Pt. 1, *State ex rel. Metz v. Bailey*, 152 W. Va. 53, 159 S.E.2d 673 (1968). "[W]e exercise due restraint and will find a statute unconstitutional only when the negation of legislative power appears to us beyond a reasonable doubt." *State ex rel. Cities of Charleston, Huntington & its Cntys. of Ohio & Kanawha v. West Virginia Econ. Dev. Auth.*, 214 W. Va. 277, 295, 588 S.E.2d 655, 673 (2003). Nevertheless, because the West Virginia Constitution expressly confers upon this Court the power of judicial review, *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 217 n.13, 470 S.E.2d 162, 171 n.13 (1996) (quoting W. Va. Const. Art. VIII, § 3), this Court necessarily "is the final arbiter of the state constitution[.]" 16 Am. Jur. 2d *Constitutional Law* § 111 (2020). And, it is "well established that it is the duty of a court to declare a statute invalid if its unconstitutionality is clear." *State ex rel. State Bldg. Comm'n v. Bailey*, 151 W. Va. 79, 92, 150 S.E.2d 449, 456 (1966). Because the West Virginia Constitution limits the Legislature to providing

---

[2]I do agree with the majority that there is standing in this case and that the claims raised by the Respondent's are ripe.

education through a system of free schools and because the Hope Scholarship Act does not otherwise meet the onerous burden of strict scrutiny review, I would have affirmed the circuit court.[3]

The Florida Supreme Court has found a voucher program similar to the Hope Scholarship program to be unconstitutional. I would follow the compelling and lucid reasoning of the Florida Supreme Court which demonstrates the clear unconstitutionality of the Hope Scholarship.

In *Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006), the Florida Legislature passed the Opportunity Scholarship Program or the OSP. Under the OSP, a student attending a public school that failed to meet certain state minimum standards was afforded the option of either transferring to a higher performing public school or using a scholarship provided by the state to attend a participating private school. *Id*. at 397, 400. A group of plaintiffs sued contenting that the OSP violated, among other provisions, Florida Constitution Article IX, § 1(a), which provides, in pertinent part,

> The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education[.]

---

[3]Because these two issues are dispositive of this case, I do not venture an opinion on any other issues addressed in the majority opinion.

6

The Florida Supreme Court found that the OSP violated the Florida Constitution as "the OSP is in direct conflict with the mandate in article IX, section 1(a) that it is the state's 'paramount duty' to make adequate provision for education and that the manner in which this mandate must be carried out is 'by law for a uniform, efficient, safe, secure, and high quality system of free public schools.'" *Bush*, 919 So.2d at 405.

The Florida Supreme Court concluded that Article XI, § 1(a) is a "Mandate with a Restriction." *Bush*, 919 So.2d 406. "Article IX, section 1(a) is a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." *Id*. "The second sentence of article IX, section 1(a) provides that it is the 'paramount duty of the state to make adequate provision for the education of all children residing within its borders.'" *Id*. at 407. "The third sentence of article IX, section 1(a) provides a restriction on the exercise of this mandate by specifying that the adequate provision required in the second sentence 'shall be made by law for a uniform, efficient, safe, secure and high quality system of *free public schools*.'" *Id*. (emphasis in original). "The OSP violates this provision by devoting the state's resources to the education of children within our state through means other than a system of free public schools." *Id*.

Like Florida's Constitution, the West Virginia Constitution imposes upon the State the duty to provide a high-quality system of free public schools. *See*, *e.g.*, Syl. Pt. 5, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979) ("The Thorough and Efficient

7

Clause contained in Article XII, Section 1 of the West Virginia Constitution requires the Legislature to develop a high quality State-wide education system."); *see also State ex rel. Trent v. Sims*, 138 W. Va. 244, 77 S.E.2d 122 (1953) ("[U]nder Section 1 of Article XII of the West Virginia Constitution, there is an absolute and mandatory duty on the part of the Legislature to 'provide, by general law, for a thorough and efficient system of free schools[.]'"). And, like Article IX, § 1(a) of the Florida Constitution, Article XIII, § 1 of the West Virginia Constitution proscribes the means by which a through and efficient education is accomplished—through a "system of *free* schools."[4]

The Florida Supreme Court also concluded that application of canons of statutory construction also lead ineluctably to this same result. "The principle of construction, 'expressio unius est exclusion alterius,' or 'the expression of one thing implies the exclusion of another,' leads us to the same conclusion." *Bush*, 919 So.2d at 407.

---

[4]The majority cites to *Herold v. McQueen*, 71 W. Va. 43, 75 S.E. 313 (1912), and *Leonhart v. Board of Education of Charleston Independent School District*, 114 W. Va. 9, 170 S.E. 418 (1933). In both of these cases, though, the Legislature was acting in furtherance of the mandate of Article XIII, § 1 to provide for a system of free schools. For example, at issue in *Herold*, was whether the Legislature could provide for the construction of a county high school. And at issue in *Leonhart* was the Legislature's creation of a county unit plan of school organization. In both of these cases, the Legislature was acting within the scope of Article XII, § 1 to provide for a thorough and efficient system of free schools. All these cases stand for is the proposition that within the scope of Article XII, § 1 the Legislature's power is almost plenary. Since the Hope Scholarship Act (or any similar plan to divert public monies to privately owned schools) is not within the purview of Article XII, § 1, they provide little support for the majority's opinion.

> [W]here the Constitution expressly provides the manner of doing a thing, it impliedly forbids its being done in a substantially different manner. Even though the Constitution does not in terms prohibit the doing of a thing in another manner, the fact that it has prescribed the manner in which the thing shall be done is itself a prohibition against a different manner of doing it. Therefore, when the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive, and it is beyond the power of the Legislature to enact a statute that would defeat the purpose of the constitutional provision.

*Id*. (quoting *Weinberger v. Bd. of Pub. Instruction*, 112 So. 253, 256 (Fla. 1927) (citations omitted)).

West Virginia, like Florida, adheres to the interpretive canon of *expressio unius est exclusio alterius*. [5] *See* Syl. Pt. 3, *Manchin v. Dunfee*, 174 W. Va. 532, 327 S.E.2d 710 (1984) ("In the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius*, the express mention of one thing implies the exclusion of another, applies."). While the majority opinion attempts to minimize this venerable doctrine, *expressio unius* "is a well-accepted canon of statutory construction." *State ex rel. Riffle v. Ranson*, 195 W. Va. 121, 128, 464 S.E.2d 763, 770 (1995); *see also Lane v. Bd. of Ed. of Lincoln Cnty.,* 147 W. Va. 737, 745, 131 S.E.2d 165, 170 (1963) (noting "the well established principle which governs the interpretation of written instruments, including . . . constitutions, [is] that the express mention of one thing implies the exclusion of another,

---

[5]The majority does cite to a concurring opinion from a previous member of this Court questioning *expressio unius*. *State v. Euman*, 210 W. Va. 519, 524, 558 S.E.2d 319, 324 (2001) (McGraw, C.J., concurring). A concurring opinion is not binding precedent. *Maryland v. Wilson*, 519 U.S. 408, 413 (1997).

9

*expressio unius est exclusio alterius*[.]"); *State ex rel. Downey v. Sims,* 125 W. Va. 627, 633, 26 S.E.2d 161, 163 (1943) ("The principle of construction here applied is so ancient that its beginning cannot be found and is supported by cases which are simply overwhelming in number."); *Julian v. DeVincent*, 155 W. Va. 320, 326, 184 S.E.2d 535, 538 (1971) (Calhoun, J., dissenting) ("This Court has consistently recognized and applied the legal principle that, in the construction of statutory language, the express mention of one thing implies the exclusion of another.").

*Expressio unius* applies to constitutional construction. "This Court has said that this applicable principle of construction is of ancient origin and extends to all instruments requiring judicial construction, contracts, deeds, statutes and constitutions." *Harbert v. Harrison Cnty. Ct*., 129 W. Va. 54, 64, 39 S.E.2d 177, 186 (1946); *see also Downey*, 125 W. Va. at 633, 26 S.E.2d at 163 ("*Expressio unius est exclusio alterius*. This classic maxim applies to all instruments requiring construction by courts—simple contracts, deeds, wills, statutes and constitutions."). Thus, under *expressio unius*, when a statute or the constitution "specifically provides that a thing is to be done in a particular manner, [this] normally implies that it shall not be done in any other manner." *Riffle*, 195 W. Va. at 128, 464 S.E.2d at 770; *see also* Syl. Pt. 1, in part, *State ex rel. Battle v. Hereford*, 148 W. Va. 97, 133 S.E.2d 86 (1963) ("A statute which provides for a thing to be done in a particular manner . . . implies that it shall not be done otherwise[.]"); *Dunham v. Morton*, 115 W. Va. 310, 313, 175 S.E. 787, 788 (1934) ("The constitutional specification of the one method of selection of county commissioners operates to the exclusion of all other

10

methods."); *State v. Gilman*, 33 W. Va. 146, 150, 10 S.E. 283, 285 (1889) ("By [the West Virginia Constitution's] granting an express authority to the legislature to regulate or prohibit the sale [of alcoholic beverages], there is an implied inhibition to the exercise of any authority in respect to that subject which is not embraced in the grant. This rule is simply an application of the old maxim, *expressio unius est exclusio alterius[.]*").

Consequently, the West Virginia Constitution provides that the Legislature's obligation to provide a through and efficient education is limited to doing so only by a system of free schools, not through subsidizing private educational systems.[6] As such, the Hope Scholarship Act and its subsidization of private education is prohibited by the West Virginia Constitution. I would, therefore, have affirmed the circuit court.

**D. Strict Scrutiny.**

Even if the Legislature has the constitutional power to enact a voucher program, we must review whether the Legislature's enactment of the Hope Scholarship Program is consonant with other constitutional limitations. And such a review establishes that the Hope Scholarship does not pass constitutional muster.

---

[6]I am not unaware of *Gissy v. Board of Education of Freeman's Creek District*, 105 W. Va. 429, 143 S.E. 111 (1928), where this Court approved of legislation requiring a board of education to pay tuition of students attending a parochial high school. In the odd facts of that case, though, the board did not maintain a high school nor assist in the maintenance of a county high school.

11

"Both the State Constitution and this Court have established that education is a fundamental right." *Meadows on Behalf of Pro. Emps. of W. Va. Educ. Ass'n v. Hey*, 184 W. Va. 75, 77, 399 S.E.2d 657, 659 (1990); *see*, *e.g.*, Syl. Pt. 3, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979) ("The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State."); *Kanawha Cnty. Pub. Libr. Bd.,* 231 W. Va. at 402, 745 S.E.2d at 440 ("This Court has unquestionably found that education is a fundamental right[.]"). "[I]f the State takes some action which denies or infringes upon a person's fundamental right to an education, then strict scrutiny will apply[.]" Syl. Pt. 2, in part, *Cathe A. v. Doddridge Cnty. Bd. of Educ.*, 200 W. Va. 521, 490 S.E.2d 340 (1997) (citation omitted). West Virginia's strict scrutiny test is the same strict scrutiny test applied by the United States Supreme Court. *Phillip Leon M. v. Greenbrier Cnty. Bd. of Educ.*, 199 W. Va. 400, 404 n.7, 484 S.E.2d 909, 913 n.7 (1996), *holding modified on other grounds by Cathe A. v. Doddridge Cnty. Bd. of Educ*., 200 W. Va. 521, 490 S.E.2d 340 (1997).[7]

Strict scrutiny "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997); *see also Miller v. Johnson*, 515 U.S. 900,

---

[7]I hasten to point out that the United States Supreme Court has specifically rejected any federal constitutional right to an education. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.").

920 (1995) (characterizing strict scrutiny as "our most rigorous and exacting standard of constitutional review.").[8] For a statute to be constitutional "[u]nder strict scrutiny, the

---

[8]The majority in Syllabus Point 7 holds that a facial challenge to a statute's constitutionality is the most difficult challenge to mount successfully. It goes on that "[t]he challenger must establish that no set of circumstances exists under which the legislation would be valid; the fact that the legislation might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." I question this new Syllabus Point. The "no set of circumstances" test was articulated in the United States Supreme Court in *United States v. Salerno*, 481 U.S. 739, 745 (1987): "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." Such language was first introduced into West Virginia law (although not carried into a Syllabus Point) by *Tony P. Sellitti Construction Co. v. Caryl*, 185 W. Va. 584, 592, 408 S.E.2d 336, 344 (1991) (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1991), in turn quoting *Salerno*). "The Tenth Circuit and leading commentators contend that the formulation in *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L.Ed.2d 697 (1987), is neither normatively desirable nor—more importantly for the Court's purposes—descriptively accurate." *United States v. Streett*, 434 F. Supp. 3d 1125, 1169 n.18 (D.N.M. 2020). Indeed, "[i]f the standard in *United States v. Salerno* were taken seriously, virtually no statute would ever be invalidated." *Id*.

Thus, the no set of circumstances language in *Salerno* has generated considerable controversy in the Supreme Court and the lower courts. *See*, *e.g.*, *United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) ("'[T]he *Salerno* rule,' has been subject to a heated debate in the Supreme Court, where it has not been consistently followed."); *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Env't Control*, 317 F.3d 357, 373 n.4 (4th Cir. 2002) (King, J., dissenting) ("[T]he *Salerno* doctrine is an embattled one at best, and its continuing viability is the subject of intense debate."); *Almerico v. Denney*, 378 F. Supp. 3d 920, 924 (D. Idaho 2019) ("*Salerno's* 'no set of circumstances' test is the subject of considerable controversy. As Plaintiffs are quick to point out . . . a faction of Justices on the Court has regularly called into question the wisdom of *Salerno*."). For example, in *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion), the Court plurality asserted that "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself." *But see id*. at 80 (Scalia, J., dissenting). I agree, therefore, with the conclusion reached by the Tenth Circuit in *Doe v. City of Albuquerque,* 667 F.3d 1111 (10th Cir. 2012):

13

government must adopt 'the least restrictive means of achieving a compelling state interest[.]'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021)

> *Salerno's* language . . . is accurately understood not as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard. In other words, where a statute fails the relevant constitutional test (such as strict scrutiny . . .), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry.

*Id.* at 1127; *see also Rothe Dev. Corp. v. Dep't of Defense,* 413 F.3d 1327, 1337–38 (Fed. Cir. 2005) ("Because, as we held before and hold again today, the strict scrutiny doctrine sets forth the test for determining facial unconstitutionality in this case, *Salerno* is of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test.").

Of course, given the heated dispute in the Supreme Court and lower federal courts concerning *Salerno*, I would go even further and find that, consistent with our sister state courts, *Salerno* has no vitality outside a facial challenge based on the federal constitution. *See Utah Pub. Emps. Ass'n v. State*, 131 P.3d 208, 214 (Utah 2006) (citing *Morales*) ("When state courts interpret their own state law, the United States Supreme Court has not required adherence to *Salerno*. . . . The Court explained that because state courts are not bound by federal law when assessing the constitutionality of state law under state constitutions, they need not follow the narrow interpretation of facial challenges found in *Salerno*."); *Commonwealth v. Ickes*, 873 A.2d 698, 702 (Pa. 2005) ("The *Salerno* test, however, is based on *dicta* and is not controlling for state courts."); *Robinson v. City of Seattle*, 10 P.3d 452, 459 (Wash. Ct. App. 2000) ("We thus reject the *Salerno* 'no set of circumstances' test as inappropriate for a taxpayer challenge under the state constitution."). Accordingly, *Salerno* is inapplicable in state constitutional challenges to state legislation. Rather than applying the "no set of circumstances" language, I would instead "apply the test dictated by the nature of the challenge." *Robinson*, 10 P.3d at 459; *see also Utah Pub. Emps. Ass'n,* 131 P.3d at 214 ("The *Morales* Court also suggested, by referencing scholarly articles on the matter, that in state law cases in state courts, a more appropriate threshold for determining the validity of facial challenges may simply exist in establishing the substantive merits of the case—the unconstitutionality of the legislation."). And in this case that test is strict scrutiny review.

14

(quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Under strict scrutiny, the statute's proponents shoulder the burden to prove the statute meets strict scrutiny's exacting criteria. *Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002). Under strict scrutiny, there is a strong presumption against an act's constitutionality. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) ("[S]trict scrutiny means that the State's system is not entitled to the usual presumption of validity[.]"); *Bartnicki v. Vopper*, 532 U.S. 514, 536 (2001) (Breyer, J., concurring) (observing that strict scrutiny comes with a "strong presumption against constitutionality"). "Only rarely are statutes sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984).

Public schools in West Virginia are funded by way of the Public School Support Plan or, as it is usually termed, the School Aid Formula. *See* W. Va. Code § 18-9A-1, *et seq*. Because net enrollment of students[9] is the primary basis for the State's allocation of funding to public schools under the School Aid Formula, a decline in enrollment necessarily results in a diminution of funding to schools. There is no doubt that the Hope Scholarship will affect the amount of funding that will flow to at least certain schools in West Virginia absent some future legislative action. *See* State's Opening Br. at

---

[9]Net enrollment is "the number of pupils enrolled in special education programs, kindergarten programs, and grades one to 12, inclusive, of the public schools of the county." W. Va. Code § 18-9A-2(i). The enrollment figures for one year are used in the School Aid Formula calculation for the following year.

15

26 ("Some districts will lose money if students leave their public schools and the Legislature does not change the current funding structure.").[10]

The majority, however, (consistent with the State's argument in its Brief before this Court) ignores whether the resulting aid decrease in the State Aid Formula by virtue of the Hope Scholarship Program satisfies the strict scrutiny test—a undertaking that would likely result in Hope's invalidation. *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004) ("As is well known, strict scrutiny readily, and almost always, results in invalidation."). Rather, it concludes that strict scrutiny review is unnecessary because any diminishment in funding under the Hope Scholarship Program does not rise to the level of a constitutional violation and, thus, does not infringe on the right to a thorough and efficient public education. I disagree with the premise and the conclusion. Such a drop in funding necessarily constitutes a constitutional violation.

"[T]here can be no doubt that public education is among the state's most basic sovereign powers. Laws that divert limited educational funds from this core function are an obvious interference with the effective exercise of that power." *Wells v. One2One Learning Found.*, 141 P.3d 225, 239 (Cal. 2006), *as modified* (Oct. 25, 2006). If a student leaves a public school with the aid of a Hope Scholarship, that school will suffer a drop in

---

[10]At oral argument before this Court, the State did not contest that absent some future act by the Legislature, in two years there would be a decrease in funds available to many public-school children.

funding under the School Aid Formula. To my mind, that constitutes an infringement on a free public education to other students in the losing school.

The majority responds that there is no cause for concern because the Legislature may alter the School Aid Formula at some point in the future to address the loss of funding due to the Hope Scholarship Program enticing students out of public schools.[11] But the constitutional validity of the Hope Scholarship Program cannot depend on what the Legislature might do to amend another code provision in the future. "The constitutional validity of the statute is to be judged as of the date of its enactment." *Gottlieb v. White*, 69 F.2d 792, 794 (1st Cir. 1934); *see also Grayson-Robinson Stores, Inc. v. Oneida, Ltd.*, 75 S.E.2d 161, 163 (Ga. 1953) ("The time with reference to which the constitutionality of an act is to be determined is the date of its passage by the enacting body[.]"). "We must test this statute by determining whether it now impairs appellants' constitutional rights, not by . . . what may result from future revision." *Moore v. Ward*, 377 S.W.2d 881, 885 (Ky. 1964). The Hope Scholarship Act is unconstitutional here and now and claims that it can somehow be amended into constitutionality by some future actions of the Legislature are untenable. *See, e.g., In re R. A. S.*, 290 S.E.2d 34, 35 (Ga. 1982) ("[O]nce a statute is declared unconstitutional and void, it cannot be saved by a subsequent statutory amendment, as there is, in legal contemplation, nothing to amend."); *Opinion of*

---

[11]That the Legislature may subsequently fix the underfunding of schools brought on by the Hope Scholarship Program is of little comfort to the students who have attended those underfunded schools and who will have had an education that does not meet constitutional minimums.

*the Justices*, 78 So. 2d 1, 2 (Ala. 1955) ("If the original act is unconstitutional and void, the amending act is likewise void."); Syl. Pt. 1, *State v. Long*, 61 So. 154 (La. 1913) ("Where an act of the Legislature has been declared unconstitutional, the Legislature cannot thereafter give it life by passing an amendment thereto. When the act has been held unconstitutional, it is thereafter nonexistent, and, as an amendment presupposes an act upon which to rest, there being no act, there can be no valid amendment of the act.").

For all the reasons I have set forth, I respectfully dissent.